(48 South. 428.)

No. 16,792.

JEFFERSON SAWMILL CO., Limited, v. IOWA & LOUISIANA LAND CO., Limited.

(Feb. 1, 1909.)

1. CORPORATIONS (§ 410*) — OFFICERS — ACTS BINDING CORPORATION.

The president of a nonresident corporation owning timber lands in this state sold with warranty certain deadened and cut trees found on lands purchased by him for the corporation. *Held*, that the sale was an act of administration, binding on the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1630; Dec. Dig. § 410.*]

2. SALES (§ 405*)—BREACH BY SELLER—DEFENSES.

Where the trees so sold could not be delivered because of adverse claims of possession and ownership, and the purchaser sued the corporation for damages for nonperformance of its contract, *held*, that the vendor cannot escape liability on the plea that the sale was null under article 2452, Rev. Civ. Code, "as the sale of a thing belonging to another person"; such nullity being relative, and in the sole interest of the bona fide purchaser, who under the very terms of the article may sue for damages.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1149; Dec. Dig. § 405.*]

3. DAMAGES (§ 40*)—BREACH OF CONTRACT—LOSS OF PROFITS.

Loss of profits may be recovered as damages for a breach of contract, if reasonably within the contemplation of the parties at the time, and if established with legal certainty.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 74–76; Dec. Dig. § 40.*

For other definitions, see Words and Phrases, vol. 2, pp. 1812–1820; vol. 8, pp. 7625, 7626.]

Provosty, J., dissenting.

(Syllabus by the Court.)

Appeal from Tenth Judicial District Court, Parish of Concordia; Hugh Tullis, Judge ad hoc.

Action by the Jefferson Sawmill Company, Limited, against the Iowa & Louisiana Land Company, Limited. Judgment for plaintiff, and defendant appeals. On rehearing. Original opinion withdrawn. Affirmed.

Dagg & Dale, for appellant. Hall & Monroe and Samuel Lucius Elam, for appellee.

On Rehearing.

LAND, J. Plaintiff sued the defendant for $63,000, damages alleged to have resulted from the failure of the defendant to deliver a large number of cut and deadened cypress trees pursuant to a contract of sale made in March, 1902.

The defendant answered, denying that it ever made or authorized or ratified the alleged contract of sale, and, in the alternative, pleaded that, if its president had authority to bind the corporation by such contract, owing to the fact that there was doubt as to the title of the defendant to the timber or the fact that the defendant desired to make a sale notwithstanding the possible defect in the title, the title was guaranteed on condition that the defendant should take the logs and timber; that delivery was made by pointing out the land on which the logs lay, and also the logs, but that plaintiff, finding that the Burton Lumber Company still asserted its claim to the logs and timber, refused and failed to take the logs and timber, or to try to do so; and that this refusal was an active violation of the contract sued on. Defendant, further answering, averred that its representative was in good faith at the time of making such contract, believing that the defendant owned and possessed said timber, but that it subsequently developed that the defendant did not own or possess any of the felled timber on the land described in the petition; that the plaintiff was not in good faith, as it had been informed by the Burton Lumber Company that "they" intended to hold said timber at all hazards, and that said company had been advised by a prominent attorney that its title was good;

and that this "defect" was not known to the defendant or its representatives at the time the option was offered or accepted.

Defendant for further answer averred that there were less than 2,000 trees on the land described in the petition, including those deadened and also those felled, and that such trees would average less than 800 feet per tree; that the damages sued for were remote, speculative, and not contemplated by the parties; that the plaintiff has never paid or tendered the agreed price for said trees, and that said trees were of less value than said price; that said logs had been cut for several years, were entangled in vines and small growth of timber, and that the cost and expenses of getting said timber to market would have left no profit to the plaintiff.

The defendant for further answer alleged that it acquired title to the lands described in the petition on March 20, 1901, but that all of the trees felled and claimed by the plaintiff herein were felled before the acquisition of said land by the defendant.

The defendant further averred that, subsequent to the time of the contract sued on, the Burton Lumber Company went upon the lands described in the petition, and commenced the removal of said timber; that the plaintiff insisted upon A. T. Averill, president of defendant company, getting out an injunction in order to preserve the timber for the plaintiffs herein; that said Averill, without any authority, instituted an injunction suit, claiming for defendant title to said trees or logs, and that final judgment was rendered in said suit decreeing that defendant had no title to said property.

The case was tried, and there was judgment in favor of the plaintiff for damages in the sum of $5,000. The defendant has appealed, and the plaintiff has answered, praying for an amendment of the judgment by increasing the amount of damages.

In December, 1897, the Mississippi Delta Lands Company, one of the authors of the defendant, through its secretary, W. H. Shields, sold to Mike Walker the right to take all the merchantable cypress timber in township 6, range 8 East, of Concordia parish. Walker represented the Burton Lumber Company. A large number of trees were deadened in 1897–98, and about 2,000 of them cut in 1898–99. In April, 1900, the Mississippi Delta Lands Company conveyed its lands in said township and other townships to Richard L. Crucey, who in March, 1901, conveyed the same land to the Iowa & Louisiana Land Company, defendant herein.

On March 13, 1902, A. T. Averill, the president of defendant company, addressed the following communication to the plaintiff company, to wit:

"We own about 4,000 cut cypress trees in the parish of Concordia, being in townships 5–8, 6–8, 7–7, all of which we are willing to sell to you at $1.50 per thousand feet, measurement to be made at the mouth of the bayou; the logs to be sold on the ground where they now lie, and to be delivered within a reasonable time. There may be some question as to the title of these logs, and hence we guarantee the title in the event you take them. We further agree to protect and defend any suits or litigation growing out of your removal and use of said logs at our own cost. Price to be paid cash. You may consider this as an option for ten days, and act on it accordingly."

This document was written in the presence of the presidents of both companies, and it was understood that Mr. Harrison, the president of the Jefferson Sawmill Company, would proceed at once to examine the timber.

Mr. Harrison, after making a partial examination, wired an acceptance of the option on March 16, 1902. It seems to have been known to both parties that Walker or the Burton Lumber Company was claiming the timber. Mr. Averill testified that at the time the option was given Mr. Harrison told him that some officer or agent of the Burton Lumber Company had told him that the logs belonged to the Burton Lumber Company. Mr. Harrison testified that he had

heard such rumors, but knew nothing except from hearsay. It is evident from the very terms of the option that it was understood that the title of the defendant company might be disputed, and that the special guaranty of the title and the stipulation to defend all suits that might arise were inserted in order to protect the prospective purchaser.

It appears that Mr. Howard Cole, president of the Mississippi Realty Company, who had participated in the negotiations which led to the sale of the logs, was empowered by the president of defendant company to represent him in the details of the execution of the contract. The acceptance of the option was wired to Mr. Cole, and many letters passed between him and Mr. Harrison relative to the execution of the agreement. On March 17, 1902, Mr. Harrison wrote that he had learned that the Burton Lumber Company was the real claimant of the timber, and intended to hold it if possible. This letter concluded:

"You know all the circumstances, and whether or not you own the timber. I, of course, do not."

Mr. Cole replied:

"I am satisfied that we have the Burton Lumber Company pretty well scared. In fact, we know exactly our position in this matter, and intend to protect ourselves."

On March 29, 1902, Mr. Harrison wrote to Mr. Cole as follows:

"There is no doubt that the Burton Lumber Company will begin to move these logs if something is not done; and, if they once get them out of the river, I am afraid we will lose them."

On April 20, 1902, Mr. Harrison wrote that he was making arrangements to have all of the timber hauled to Cocodrie bayou. On April 30, 1902, Mr. Harrison wrote Mr. Cole that he had learned that the logs were floated about the mouth of Bayou Cocodrie, and inquired whether the Burton Lumber Company had taken the logs out of the parish. This letter concludes as follows:

"What progress had been made with the lawsuit? An arrangement satisfactory to our board of directors must be made in a short time. If they cannot be assured they will get the logs they actually bought, they will insist upon settlement for the profit value."

After other correspondence, a suit was filed in the name of the defendant company against the Burton Lumber Company and Mike Walker, enjoining them from trespassing on the lands of the petitioner in townships 5–8, 6–8, and 5–9, and from removing timber therefrom. The defendants in said suit moved to dissolve the injunction on bond as to the timber already cut and severed from the soil. This motion was granted on the defendants furnishing bond and security in the sum of $11,000, conditioned for the delivery of the property and the payment of damages. This bond was furnished, and the cut timber was left at the disposal of the Burton Lumber Company. The Iowa & Louisiana Land Company, after moving in vain for a suspensive appeal from the dissolving order, applied to the Supreme Court of the state for writs of mandamus. This application, however, was abandoned, and an attempt was made to get possession of the logs through the Mississippi Delta Lands Company represented by Howard Cole, president, who had been acting as agent for the Iowa & Louisiana Land Company. In November, 1902, the Mississippi Delta Lands Company sued the Burton Lumber Company for 4,000 cypress trees cut on the lands in townships 5–8, 6–8, and 6–9 while they belonged to the former company, and caused a writ of sequestration to issue. Under the writ, 1,517 logs were seized. The Burton Lumber Company bonded out 1,400 of these logs which it admitted had been cut on the lands described in the plaintiff's petition. The case was tried, and in May, 1903, judgment was rendered in favor of the plaintiff for 2,200 trees or their value, fixed at $2,200. The court held that, as the Burton Lumber

Company had purchased the timber in good faith, it was liable for only the stumpage value of the trees.

The injunction suit was also decided in May, 1903, and resulted in a judgment restraining the defendants from further trespassing on the lands described in the petition. This judgment was in legal effect against the plaintiff in injunction quoad the timber, which had been cut and severed from the soil. In both suits the Burton Lumber Company claimed that it had deadened and cut only 2,200 trees on the lands in question.

It thus appears that in March, 1902, at the time the option was given and accepted, the Iowa & Louisiana Land Company did not own the cut trees which were conveyed by that instrument, and that the 2,200 trees, more or less, which had been cut on the lands described in the option, were in possession of the Burton Lumber Company under color of title. The Iowa & Louisiana Land Company had notice of this adverse claim, but nevertheless sold the trees with a special guaranty of title, and undertaking to protect the purchaser and to defend all suits that might arise over the subject-matter of the contract.

The Iowa & Louisiana Land Company was a nonresident corporation, and through its president purchased some 145,000 acres of timber land in the parish of Concordia. The sale of cut trees and logs found on the lands of the company, and presumably belonging to it was an act of administration within the general powers of its chief executive officer. The ignorance of the board of directors as to all the acts of its president in the state of Louisiana relating to the sale of the logs and as to all the litigation growing out of such sale demonstrates that the board confided all such matters to the discretion of the president.

The contention that the plaintiff violated the contract by refusing to take possession of the logs is without merit, as they were in the adverse possession of the Burton Lumber Company holding under color of title. The defendant company resorted to an injunction suit to prevent the removal of the timber by the Burton Lumber Company, and failed.

The further contention that the sale was conditioned on the vendee taking possession of the logs is without force, as the contract recites that the same were to be delivered by the vendor in a reasonable time.

Defendant does not in his pleadings seek to rescind the contract for any error of fact as to its ownership of the cut trees, but in argument contends that the sale, being of the property of another, was therefore null and productive of no legal obligations between the parties.

The Revised Civil Code reads:

"The sale of a thing belonging to another person is null; it may give rise to damages, when the buyer knew not that the thing belonged to another person." Article 2452.

The terms of this law do not limit the liability for damages to the vendor in bad faith.

This article corresponds with article 1599 of the Code Napoléon, which has given rise to much discussion among the French jurists. Baudry-Lacantinerie argues that the sale of a thing belonging to another is not absolutely null, because such a contract produces certain legal effects, such as giving rise to damages in favor of the purchaser, to the obligation of warranty on the part of the vendor, and furnishing the purchaser with a just title for the purposes of prescription or of acquiring the fruits of the thing. In support of this proposition, that author cites Cass. 4 Mars 1891, D. 91, 1, 313; Troplong, 1, note 238; Laurent XXIV, N. 115, 116; Guilbouard, 1, N. 182; Huc. X, n. 64, 65, 66; and concludes as follows:

"La nullité est relative; elle ne peut être proposée que par l'acheteur, dans l'intérêt du-

quel elle a été édictée." Id. De La Vente, pp. 94, 95. "The nullity is relative. It can be invoked only by the purchaser, in whose interest it has been imposed."

This author reasons that the error of the vendor who believes himself owner is less excusable than the error of the purchaser who considers him as such, and that the vendor, having obliged himself to transfer the ownership of the property, should exert his best efforts to execute this obligation, and should be condemned in damages if he should fail to do so. Id. pp. 95, 96.

Laurent says:

"Dans notre opinion, la nullité est relative; elle est établie dans l'intérêt de l'acheteur et contre le vendeur qui vend une chose dont il lui est impossible de transférer la propriété à l'acheteur." Id. Tome 24, No. 115.

We translate as follows:

"In our opinion, the nullity is relative. It is established in the interest of the purchaser and against the vendor who sells a thing, the ownership of which it is impossible for him to transfer to the purchaser."

The same commentator says that Marcade was of the opinion that the sale of a thing of another is radically null and inexistent, and that this opinion had been followed by some writers, but that the contrary opinion was more generally adopted and was consecrated by jurisprudence. Id. No. 103.

Mourlon discusses article 1599 of the Code Napoléon in his usual clear and forcible style. He says that the sale of the thing of another is null, because, the purchaser not having received the equivalent of the price, his obligation is without a cause or consideration; that in such a case the purchaser in good faith has an action in warranty even against the vendor in good faith to recover damages; and that such a sale produces several legal effects, to wit: (1) It obliges the vendor to deliver. (2) It obliges him to warrant the purchaser in good faith against eviction. (3) It serves the purchaser as a just title for acquiring the fruits

and for the prescription of 10 years. Mourlon, Examen. Du Code Napoléon. T. 3, Nos. 515–521.

Our jurisprudence on the subject is rather meager. In Palfrey v. Stinson, 11 La. 77, the court held that a vendor, having assumed to sell as sole proprietor, could not afterwards say that he was only part owner. In Lafon v. De Armas, 12 Rob. 626, the court incidentally discussed article 20, p. 348, Civ. Code 1808, declaring that "the sale of a thing belonging to another is null," and said:

"It is null in a certain sense—that is, so as not to operate a transfer of the property against the real owner—but it is not null in a certain other sense as respects the parties, since it may give rise to damages. If it was absolutely null, it would produce no effect—'quod nullum est, non producit effectum.' "

The court then proceeds to point out that a subsequent article of the same Code makes such a sale a just title for the purposes of prescription, and concludes:

"Thus a certain effect is given to such a sale. It may be the basis of a just title, sufficient to prescribe under; and, if it was absolutely null, it would have no such effect."

In this case Judge Simon, as the organ of the court, advanced reasons which were subsequently assigned by the French commentators already cited, and which seem to have been approved by the French courts.

On the part of the defendant two cases have been cited in neither of which was article 2452 (2427) of the Revised Civil Code mentioned.

In Williams v. Hunter, 13 La. Ann. 476, Mrs. Hunter, widow in community, obligated herself in case she refused to make Williams good and warranted titles to a certain described tract of land to pay him $2,000 as a forfeit or penalty. It developed that Mrs. Hunter could not make a good title because she owned only a half interest in the land; the other half belonging to her minor children. Williams thereupon sued for the penalty. The court refused to enforce the pen-

alty, because it was legally impossible for Mrs. Hunter to comply with the agreement, citing Rev. Civ. Code, 2116. Among other reasons assigned were that Mrs. Hunter acted in good faith, and was induced to promise to sell by an error of fact and of law.

In Wilberding v. Maher, 35 La. Ann. 1182, the court refused to enforce a specific performance of an agreement by a widow to sell certain real estate affected by a general mortgage of which she was ignorant, and which it was legally impossible for her to have canceled. It appeared that the property had been acquired by Mrs. Maher in her own name during the marriage, and that she believed it to be her separate property. The court held that there was error of law, and that the defendant was entitled to relief under Rev. Civ. Code, art. 1819.

We do not think that either of these cases can be considered as precedents as to the construction of article 2452 of the Revised Civil Code, which was not even mentioned in the opinions of the court. Our conclusion is that the defendant company is liable in damages to the plaintiff company for its failure to perform its obligations as vendor in the contract of sale, and that the word "damages," as used in article 2452, has the same meaning as in other articles of the Revised Civil Code, and therefore includes loss of profits not speculative or uncertain in their nature.

The things sold were described as about 4,000 "cut cypress trees," but it is admitted that this term was intended to include both deadened and cut cypress. On May 5, 1902, the plaintiff wrote to defendant's agent as follows:

"It was also my understanding that we were to have the deadened and cut cypress on your lands in Concordia parish, but, as the option does not read quite as broad, I wanted it understood. This is now satisfactory."

122 La.—32

The deadened cypress on the lands at the date of the sale belonged to the defendant company, and, as to such trees, it cannot be contended that the company was in default as to delivery. Plaintiff's own surveyors testified that 1,825 trees had been cut on the lands, and that they found on the ground about 600 cut logs. The same surveyors also found 2,500 deadened cypress trees. The result represents 4,325 trees deadened and cut, and the contract called for about 4,000.

There can be no doubt that the parties had in view the cypress which had been cut for the Burton Lumber Company. The only trees which the defendant failed to deliver were those removed by the Burton Lumber Company. The report of plaintiff's surveyors leaves the number of trees in doubt, and anywhere between 1,225 and 1,825. In the sequestration suit of the Mississippi Delta Lands Company already mentioned 1,400 cypress trees were seized and identified as having been cut and removed by the Burton Lumber Company from the lands of the defendant. It is, however, shown by the testimony of Mr. Connell, president and manager of the Burton Lumber Company, that during the year 1903 his company received and sawed 1,921 trees taken from the lands of the defendant. Mr. Connell testified that the trees averaged 800 feet each. Mr. Harrison, the president of plaintiff company, who saw a large number of the same logs while floating in the bayou, estimated that they averaged 750 feet each. According to Mr. Connell the 1,921 trees measured 1,537,000 feet. The surveyor's guess estimates of from 1,500 to 2,200 feet per tree are entitled to but little consideration in the face of the estimates of two practical sawmill men who saw the trees. Assuming that the trees removed by the Burton Lumber Company represented 1,537,000 feet of lumber, the next question is as to the loss of profits, if any. Plaintiff's evidence shows a loss of $4.50 per

1,000 feet. Defendant's evidence shows that there was no profit in the transaction. The trial judge held that the evidence showed a loss of at least $5,000, for which he gave judgment.

The evidence is conflicting, and the finding of the trial judge is not manifestly erroneous. We cannot say that a greater loss has been established with certainty.

Judgment affirmed.

PROVOSTY, J., dissents.